Frank D. Mylar (5116)
MYLAR LAW, P.C.
2494 Bengal Blvd.
Salt Lake City, Utah 84121
Phone: (801) 858-0700
FAX: (801) 858-0701
Mylar-Law@comcast.net

Attorney for Defendant

IN THE UNITED STATES DISTRICT COURT, DISTRICT OF UTAH

NORTHERN DIVISION

| | |
|---|---|
| **MICHAEL AMES**,<br><br>    Plaintiff,<br>v.<br><br>**TODD CHRISTENSEN,**<br><br>    Defendant. | **DEFENDANT'S MOTION AND MEMORANDUM FOR SUMMARY JUDGMENT**<br><br>Case No. 2:12-CV-481-DB<br><br>District Judge Dee Benson |

DEFENDANT, TODD CHRISTENSEN, through his attorney, Frank D. Mylar, respectfully submits this Motion and Memorandum for Summary Judgment. This Motion and Memorandum is supported by the pleadings, the affidavits of Deputy Todd Christensen and Corporal Chet Hartley, and the following arguments:

## INTRODUCTION

Plaintiff brings this suit alleging violation of the United States Constitution under 42 U.S.C. § 1983 claiming he was subjected to a "deliberate act of pain and suffering," and "reckless use of a lethal weapon causing injuries" by Defendant. (Compl. ¶ C1). Defendant filed an Answer, and the Court ordered Defendant to file a *Martinez Report* along with a motion for summary judgment at his discretion.

Plaintiff's suit stems from the events surrounding his arrest on March 25, 2011. At that time, Plaintiff was considered a serious and immediate threat to citizens and officers and he directly threatened Defendant just prior to shooting. Defendant was justified in using lethal force to apprehend Plaintiff after Plaintiff pointed what appeared to be a firearm at Defendant. Plaintiff had already reportedly stolen a car at gunpoint while officers were searching for him. The undisputed facts show that Defendant, as a matter of law, cannot be held liable for shooting Plaintiff.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1. Plaintiff was, during the relevant time, a pre-trial detainee at the Weber County Jail. Plaintiff's Amended Complaint was filed on September 19, 2012, approximately a year and a half after the alleged incident.

2. On March 25, 2011, Plaintiff claims he was subjected to a "deliberate act of pain and suffering," and "reckless use of a lethal weapon causing injuries" by Defendant.

3. Defendant Todd Christensen is currently a Deputy with Weber County Sheriff's Office where he has been employed for the last twelve years. (Affidavit of Defendant Todd Christensen ¶ 2). He is certified by the Utah Division of Peace Officers Standards and Training (POST). (Christensen Aff. ¶ 3).

4. Christensen is familiar with the Weber County Sheriff's Office Use of Force Policy, and has received training on when and how the use of firearms is appropriate. (Christensen Aff. ¶ 4).

5. On March 25, 2011, Christensen was at a training session at Weber County Sheriff's Office, when he heard a request from dispatch over the radio for help setting up a perimeter in West Haven, Utah, to contain Plaintiff, who was armed and fleeing from law enforcement. Christensen immediately informed dispatch he would be helping set up this perimeter. He then got in his vehicle and proceeded to the location. (Christensen Aff. ¶ 5).

6. Christensen was told Plaintiff threatened to kill bank employees with a gun, pointed a gun at a female, threatened her life, and stole her vehicle. (Christensen Aff. ¶ 6).

7. While driving to assist with setting up this perimeter, Christensen heard from dispatch that Plaintiff had stolen a vehicle at gunpoint and was heading toward a house by 40th Street in Ogden, Utah, where Plaintiff's drug dealer was believed to live. (Christensen Aff. ¶ 7)

8. After some unsuccessful searching for Plaintiff in that area, Christensen began to hear a lot of yelling and one gun shot coming from somewhere nearby. (Christensen Aff. ¶ 9).

9. Christensen continued searching until he determined which house the yelling was coming from, which was later determined to be 3940 Raymond Avenue. (Christensen Aff. ¶ 10).

10. From inside the house, Christensen could hear female, blood curdling, horrific screams. He could hear other screaming in the house as well. (Christensen Aff. ¶ 11).

11. Other officers were telling Christensen "this is the house." (Christensen Aff. ¶ 12).

12. The house at 3940 Raymond Avenue faces west, with its front door located on the center of the west side of the house. There is a driveway on the north side of the house, that led into the backyard. (Christensen Aff. ¶ 13).

13. Christensen proceeded on foot, outside the front of the house, up along the house's driveway, to arrive at the northeast corner of the house, which was the backyard. He was followed by Deputy Trent Wilson. Christensen had his handgun, Wilson had his assault rifle. (Christensen Aff. ¶ 14).

14. From this vantage point at the northeast corner of the house, Christensen saw several officers who were outside at the southeast corner of the house, also in the backyard, as well as one officer further in the backyard, directly east of the house. (Christensen Aff. ¶ 15).

15. From inside the house, Christensen could hear people screaming to get out. (Christensen Aff. ¶ 16).

16. Since the Plaintiff had already threatened the lives of bank employees, car-jacked an innocent woman at gunpoint, and because Christensen had heard a gun shot while approaching the

house, and heard a female screaming inside, he believed justification for the use of deadly force existed and that the armed intruder (Plaintiff) needed to be stopped to protect the life of the innocent persons inside the home and the officers outside as well. (Christensen Aff. ¶ 17).

17. Corporal Chet Hartley of the Weber County Sheriff's Office was also assisting with looking for Plaintiff Ames. He also believed Plaintiff to be armed and dangerous. (Hartley Aff. ¶ 5).

18. About 4:00 p.m., Hartley learned Plaintiff had entered a house located at 3940 Raymond Avenue, Ogden, Utah. Hartley took up position on the southeast corner of the house, which was in the backyard, with two other officers. (Hartley Aff. ¶ 6).

19. After a short time of waiting at this corner, Hartley saw Deputy Todd Christensen on the northeast corner of the house. Hartley recognized he was in a cross fire situation so he maintained a cover position. (Hartley Aff. ¶ 7).

20. While standing at the northeast corner of the house, Christensen saw two people run out of the back door nearest the northeast corner of the house, just a few feet away from where he was standing. He took about three steps backwards. He later discovered that these two people were the homeowner and Plaintiff. (Christensen Aff. ¶ 18).

21. Christensen saw an individual with a baseball bat in his hand, who he later determined to be the homeowner. The other individual, who he later discovered was Plaintiff, was trying to get away from the homeowner who was chasing him with the baseball bat. (Christensen Aff. ¶ 19).

22. At this point, Christensen saw Plaintiff had a gun in his right hand. (Christensen Aff. ¶ 20).

23. The homeowner hit Plaintiff in the head with the baseball bat right in front of Christensen. This occurred approximately five to eight feet from the east door they had exited, and five to eight feet in front of Christensen. (Christensen Aff. ¶ 21).

24. Hartley also saw the two males exit the back door. Hartley saw the homeowner strike Plaintiff in the head. (Hartley Aff. ¶ 8).

25. Plaintiff was struck on the left side of the head, which caused him to move in a north direction, towards Christensen. (Hartley Aff. ¶ 9).

26. This blow did not stop Plaintiff. Plaintiff turned and looked at Christensen. He had the gun in his right hand, and he pointed it at Christensen. (Christensen Aff. ¶ 22).

27. In response to this aggression, Christensen rapidly shot five rounds from his handgun at Plaintiff who immediately fell to the ground and dropped the gun. (Christensen Aff. ¶ 23).

28. Hartley started to advance from his position and saw Christensen point his pistol at Plaintiff. Hartley heard several shots ring out very fast. He then saw the suspect fall to the ground. The entire exchange took about two seconds. (Hartley Aff. ¶ 10).

29. Hartley was only about 10 feet away from Plaintiff when Christensen fired these shots. No shots were fired after the Plaintiff fell to the ground. (Hartley Aff. ¶ 11).

30.     The entire event occurred very quickly, and Christensen had to make a split second decision to protect himself and others from Plaintiff who was armed and fleeing. (Christensen Aff. ¶ 24).

31.     From the time Plaintiff and the homeowner exited the house to the time Christensen discharged his firearm, approximately three seconds elapsed. (Christensen Aff. ¶ 25).

32.     Christensen held cover on Plaintiff and yelled for someone to handcuff him. (Christensen Aff. ¶ 26).

33.     After Officer Trevor Barker handcuffed Plaintiff, Christensen sat Plaintiff up so that his injuries could be assessed. (Christensen Aff. ¶ 27; Hartley Aff. ¶¶ 13-14).

34.     Christensen observed Plaintiff was bleeding quite extensively from the head, but he was talking. (Christensen Aff. ¶ 28).

35.     Christensen observed Plaintiff's weapon in two pieces on the ground beneath him. (Christensen Aff. ¶ 29).

36.     Shortly thereafter, Corporal Hartley escorted Christensen away from the scene. (Christensen Aff. ¶ 30).

37.     Christensen believes his actions that day were lawful and consistent with the Weber County Sheriff's Use of Force Policy. Plaintiff was an armed and dangerous fleeing felon who had already threatened the lives of several people and Christensen believed Plaintiff could seriously injure or kill innocent people. (Christensen Aff. ¶ 31).

38. Plaintiff posed a direct threat to Christensen's safety when he turned toward him after coming out of the house with what appeared to be a gun in his hand. (Hartley Aff. ¶ 12).

39. Christensen is not aware of any grievances that Plaintiff has filed against him at any level or institution. (Christensen Aff. ¶ 32).

## ARGUMENT

### POINT I

**PLAINTIFF CANNOT SHOW A CONSTITUTIONAL OR STATUTORY VIOLATION**

Plaintiff does not allege a specific constitutional or statutory violation in his Complaint, only that he was subjected to a "deliberate act of pain and suffering," and "reckless use of lethal weapon causing injuries." (Compl. ¶ C(1)). Specifically he claims he was shot in the back twice while laying on the ground. (Compl. ¶ B(1). He does not claim he was wrongfully arrested, seized, or searched without probable cause. To the contrary, Plaintiff was shot only because he directly threatened Officer Christensen and had previously just threatened several people with serious bodily harm and had perhaps caused serious bodily harm to the occupants of the home he unlawfully entered and the driver of a vehicle he stole at gunpoint. For this reason, the Fourth Amendment may not apply. The only other possible claim Plaintiff could assert is a violation of his Fourteenth Amendment substantive due process rights. However, Plaintiff has not made a valid claim for such a violation or any other statutory or constitutional violation and, therefore, Defendant's Motion for Summary Judgment should be granted.

**Fourth Amendment:**

As state above, Plaintiff does not allege that Defendant lacked probable cause to arrest him nor does he contend that Defendant physically seized him. Instead, Defendant was faced a self-defense and defense of third persons decision. For this reason, the Fourth Amendment may not even apply. See generally, *County of Sacramento v. Lewis*, 523 U.S. 833 (1998), holding that the officers use of deadly force was not intended by the officers and, therefore, the Fourteenth, rather than the Fourth Amendment applied. *Id. at 843-44.* See also, *Brooks v. Gaenzle, 614 F.3d 1213 (10th 2010), holding Fourth Amendment inapplicable to shooting a fleeing felon who was not captured by the officer at that time.* These cases add some confusion as to whether the Fourth Amendment is applicable when an officer shoots a fleeing felon purely in self-defense and/or the protection of others from serious bodily harm. However, in this case, Plaintiff's claim must fail under both the Fourth and Fourteenth Amendments.

In this case, it was appropriate for Defendant to use deadly force against Plaintiff based upon the danger he objectively posed to Defendant, other officers, and civilians. The law unequivocally allows an officer to deploy deadly force and inflict serious bodily injury, "(1) where the suspect has placed the officer in a dangerous, life threatening situation; or (2) where the suspect is fleeing from the commission of an inherently violent crime." *Ryder v. City of Topeka, 814 F.2d 1412, 1419 (10th Cir. 1987).* "This latter situation does not require that the officer's life actually be threatened by the suspect. Rather, the officer is allowed to infer that the suspect is inherently dangerous by the violent nature of the crime." *Id.*

In this case, Plaintiff cannot show a violation of the Fourth Amendment. It is undisputed that Plaintiff was a fleeing felon when Defendant responded to the scene in that he was wanted for an armed robbery, an armed car-jacking, and criminal trespass into a home and threatening the residents, all within a matter of minutes. The nature of his crime spree and officer chase by car and on foot provide the necessary support for Defendant to objectively conclude that Plaintiff was dangerous and had committed "inherently violent crimes." Although Plaintiff need not satisfy both prongs of the above Fourth Amendment excessive force test, he does meet both.

Plaintiff had used a gun of some sort to complete a robbery, a car-jacking, and had something resembling a gun on his person when he confronted Defendant. Defendant had heard a gun shot after he arrived on the scene. He then heard terrible screams from the house followed by two men running out the front door. Defendant saw what appeared to be a gun in Plaintiff's hand and he turned toward Defendant and pointed it at him. He was faced with literally a split-second decision to shoot Plaintiff or face death or serious bodily harm. He shot five times and Plaintiff then fell to the ground. Defendant did not fire a single after Plaintiff fell to the ground. Instead, other officers came to Plaintiff and handcuffed him and assessed his injuries. As a matter of law, Defendant was justified in deploying deadly force and he did not violate Plaintiff's Fourth Amendment rights.

**Fourteenth Amendment:**

Only if the Court finds that the Fourth Amendment does not apply, may it proceed to evaluate a Fourteenth Amendment substantive Due Process claim. *County of Sacramento v. Lewis*, 523 U.S. at 843. If the Fourth Amendment does not apply, Plaintiff has an even more difficult burden under

the Fourteenth Amendment. "[T]he touchstone of due process is protection of the individual against arbitrary action of the government." *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974). The "Due Process Clause is violated by executive action only when it 'can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense.'" *County of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998) quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 128 (1992). "Due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm." *Id.* at 848. Police have obligations that tend to tug against each other. Their duty is to restore and maintain lawful order, while not exacerbating disorder more than necessary to do their jobs. They are supposed to act decisively and to show restraint at the same moment. *Id*. at 853. Only a purpose to cause harm unrelated to the legitimate object of arrest will satisfy the shocks-the-conscience test. *Id.* at 833. When an officer is in a high-pressure situation where time is of the essence, there must be evidence of a purpose to cause harm unrelated to the legitimate object of the arrest to satisfy the element of arbitrary conduct shocking to the conscience for a due process violation. *Ellis v. Ogden City*, 589 F.3d 1099, 1102 (10th Cir. 2009) (quoting *County of Sacramento v. Lewis,* 523 U.S. at 836).

In the current suit, Christensen's actions cannot be characterized as "arbitrary or conscience shocking" as required for a Due Process violation. While Christensen did shoot and harm Plaintiff (Christensen Aff. ¶ 23), Plaintiff had already threatened to kill bank employees with a gun, car-jacked a woman at gun point, and invaded an occupied home. (Christensen Aff. ¶6, ¶¶ 10-12). In light of these actions, Plaintiff could have harmed or killed innocent people if he was not

immediately apprehended. (Christensen Aff. ¶6, ¶ 31; Hartley Aff. ¶ 5, ¶ 12). Christensen had to act quickly after Plaintiff had pointed a gun at him. (Christensen Aff. ¶ 22). Christensen only had a few seconds to react to the situation (Christensen Aff. ¶¶ 24-25; Hartley Aff. ¶ 10), and he made a split-second decision that would "restore and maintain lawful order." 523 U.S. at 838. No other shots were fired after Plaintiff fell to the ground. (Hartley Aff. ¶ 11). After the shooting, Plaintiff was immediately handcuffed, sat up, and assessed for injuries. (Christensen Aff. ¶¶ 27-28; Hartley Aff. ¶ 14). This shows Christensen did not intend to cause harm outside of the legitimate object of arresting Plaintiff. 523 U.S. at 833. Christensen's actions were reasonable under the circumstances and do not shock the conscience. Therefore, Christensen's actions do not meet the threshold of a Due Process violation against Plaintiff.

## POINT II

**PLAINTIFF'S CLAIMS ARE BARRED BY QUALIFIED IMMUNITY**

A defendant who raises an affirmative defense of qualified immunity effectively shifts the burden to the plaintiff as a matter of law to show that (1) the defendant's actions violated a constitutional or statutory right, and (2) the right was clearly established at the time of the defendant's conduct. *Anderson v. Creighton*, 107 S. Ct. 3034 (1987); *Romero v. Board of County Commissioners*, 60 F.3d 702 (10th Cir. 1995). The plaintiff must also demonstrate that "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." 107 S. Ct. At 3039. Mere existence of a broad and general right is insufficient to hold a government official liable. *Id.* Only if the plaintiff proves these two elements,

in light of the undisputed facts may he survive a motion for summary judgment based upon qualified immunity.

Courts have upheld officials' qualified immunity against Federal claims to avoid the "diversion of official energy away from pressing public issues." *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982); *Bisbee v. Bey*, 39 F.3d 1096 (10th Cir. 1994). Immunities also preclude the "deterrence of able citizens from acceptance of public office," and to preclude lessening of "'the ardor of all but the most resolute, or the most irresponsible [public officials], in the unflinching discharge of their duties.'" *Harlow*, 475 U.S. at 814 (quoting *Gregoire v. Biddle*, 177 F.2d 579, 581 (2nd Cir. 1949)).

In this case, Christensen is entitled to Qualified Immunity because none of his actions were contrary to clearly established law as stated in Point I above. Defendant was called to a dangerous situation and had received information about the dangerous conduct of Plaintiff toward citizens and police. Rather than Defendant violating clearly established law, the law was in fact clearly established that an officer may shoot and kill a dangerous fleeing felon. See *Ryder v. City of Topeka, 814 F.2d at 1419*. Immunity is further provided specifically for officers who must make "split-second" decisions between harming a suspect themselves and the public. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor, 490 U.S. 386, 396, 104 L. Ed. 2d 443, 109 S. Ct. 1865 (1989)*. Courts must further defer to "the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that **[*10]** is necessary in a particular

situation." *Id. at 397*. This is exactly the situation with this case. Defendant had at most 2 or 3 seconds to react when Plaintiff came out of the house. He had heard a gun shot followed by horrific screams. The situation was tense and this Court should not second guess the objectively reasonable actions of Deputy Christensen. Therefore, Plaintiff's claims must be dismissed based upon Qualified Immunity.

**WHEREFORE:** All Plaintiff's claims should be dismissed and Plaintiff should be ordered to pay Defendant's attorney fees and costs under 42. U.S.C. § 1988.

Dated this 28th day of May, 2013

/s/ *Frank D. Mylar*
_____
Frank D. Mylar
Attorney for Defendant

### CERTIFICATE OF ALTERNATE SERVICE

I certify this 28th day of May, 2013, counsel's office mailed an exact copy of this **DEFENDANT'S MOTION AND MEMORANDUM FOR SUMMARY JUDGMENT** that is filed with the United States District Court, Electronic Filing System, upon Plaintiff's last known address at:

Michael Ames, Inmate
UTAH STATE PRISON # 36474
OQU #3 204B
P.O. Box 250
Draper, Utah 84020

/s/ *Frank D. Mylar*
_____
Frank D. Mylar